46 A.3d 1182

Ellis C. BURRUSS, et al.

v.

BOARD OF COUNTY COMMISSIONERS OF FREDERICK COUNTY, et al.

No. 99, Sept. Term, 2011.

Court of Appeals of Maryland.

June 25, 2012.

232

234

John L. Thompson, Jr., Walkersville, MD, for appellants.

Daniel B. Loftus (Daniel B. Loftus, P.C., Frederick, MD), on brief, for appellees.

John S. Mathias, Co. Atty. (Michael J. Chomel, Sr., Asst. Co. Atty., Frederick, MD), on brief, for appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, WILNER, and ALAN M. (Retired, Specially Assigned), JJ.

GREENE, J.

On March 10, 2011, the Board of County Commissioners of Frederick County (BOCC) appointed a nine-member charter board, in accordance with the provisions of Md. Const. art. XI–A, § 1A.[1] Article XI–A, section 1A of the Maryland Constitution provides that, upon satisfaction of certain requirements, the board of county commissioners shall hold a special election for consideration of additional nominated charter board members. To request a special election under this provision, a petition must be submitted to the board of county commissioners containing the signatures of three percent of the regis-

---

1. Md. Const. art. XI–A, § 1A provides, in relevant part:

The board of county commissioners of any county at any time may appoint a charter board. Said charter board shall be registered voters and shall consist of an uneven number of members, not fewer than five or more than nine. The board of county commissioners shall appoint a charter board within thirty days after receiving a petition signed by five percent of the registered voters of the county or by ten thousand voters of the county, whichever is the lesser number. If additional charter board members are nominated by petitions signed by three percent of the registered voters of the county or by two thousand registered voters, whichever is the lesser number, delivered to the board of county commissioners within sixty days after the charter board is appointed, the board of county commissioners shall call a special election not less than thirty or more than ninety days after receiving petitions, unless a regular election falls within the designated period. The appointees of the board of county commissioners and those nominated by petitions shall be placed on the ballot in alphabetical order without party designation. The voters may cast votes for, and elect a number of nominees equal to the number of charter board members originally selected by the board of county commissioners, and those so elected are the charter board.

tered voters in the county or two thousand registered voters, whichever is less. Md. Const. art. XI–A, § 1A. Ellis C. Burruss and other individuals who sought membership on the charter board (collectively, Petitioners)[2] circulated a petition in support of nominating candidates for consideration at a special election. On May 9, 2011, Petitioners submitted to the BOCC a petition purporting to contain 2,915 signatures of registered voters in Frederick County. The Frederick County Board of Elections (the Board) thereafter engaged in the process of validating, verifying, and counting the petition entries. Upon review of the petition submitted by Petitioners, and the signatures contained therein, the Board determined that Petitioners did not satisfy the statutory and constitutional requirements necessary for the BOCC to call a special election. Specifically, the Board determined that many of the submitted petition signatures were invalid under Md.Code (2002, 2010 Repl.Vol.), § 6–203 of the Election Law Article,[3] as interpreted by this Court in *Montgomery Cnty. Volunteer*

---

**2.** Petitioners in this case are Ellis C. Burruss, Rolan O. Clark, Patrice A. Gallagher, Paul J. Gilligan, Daniel P. Laxton, Aaron A. Valentino, and Russell N. Winch. As indicated in the Petition for Judicial Review, Petitioner Patrice A. Gallagher was a circulator of the petition, but she did not seek nomination for membership on the charter board.

**3.** Md.Code (2002, 2010 Repl.Vol.), § 6–203 of the Election Law Article provides, in relevant part:

(a) *In general.*—To sign a petition, an individual shall:
(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and
(2) include the following information, printed or typed, in the spaces provided:
(i) the signer's name as it was signed;
(ii) the signer's address;
(iii) the date of signing; and
(iv) other information required by regulations adopted by the State Board.
(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:
(1) the requirements of subsection (a) of this section have been satisfied;

*Fire–Rescue Ass'n v. Montgomery Cnty. Bd. of Elections*, 418 Md. 463, 15 A.3d 798 (2011) [hereinafter Fire–Rescue]. Stuart Harvey, Election Director and Chief Election Official, notified the BOCC of the Board's determination.[4]

Pursuant to Md.Code (2002, 2010 Repl.Vol.), § 6–209 of the Election Law Article, Petitioners filed a Petition for Judicial Review in the Circuit Court for Frederick County seeking a declaratory judgment that the Board incorrectly applied the law regarding validation of petition signatures and that the applicable law was whether there was "sufficient cumulative information," a phrase appearing in *Fire–Rescue*, from which the Board could identify a signatory on a petition as a registered voter in Frederick County. Petitioners also claimed that the doctrine of offensive non-mutual issue preclusion bound Respondents to the determinations of law made by the Circuit Court for Anne Arundel County in *Libertarian Party, et al. v. Md. State Bd. of Elections, et al.*[5] In their alternative argument, Petitioners contended that if the court

---

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

4. Respondents in this case are the Board of County Commissioners of Frederick County (BOCC), the Frederick County Board of Elections (the Board), and Stuart Harvey.

5. The case of *Md. State Bd. of Elections v. Libertarian Party*, 426 Md. 488, 44 A.3d 1002 (2012) was recently on review in this Court. The Libertarian Party and the Green Party had submitted to the Maryland State Board of Elections petitions for the purpose of regaining their statuses as new political parties, as well as their ballot access privileges. *Libertarian Party*, 426 Md. at 490–91, 44 A.3d at 1003. Following a determination by the State Board that the petitions contained an insufficient number of valid signatures, pursuant to the mandates of Md.Code (2002, 2010 Repl.Vol.), § 6–203(a) of the Election Law Article, the Libertarian and Green Parties filed a Complaint in the Circuit Court

did not adopt their suggested "sufficient cumulative information" standard for validation of petition signatures, § 6–203(a) and COMAR § 33.06.03.06B(1) [6] should be declared unconstitutional.

Following a hearing on the various issues, the Circuit Court judge affirmed the determination made by the Board that the petition contained an insufficient number of valid signatures to require the BOCC to hold a special election. The judge stated, in open court, essentially that the signature validation requirements in § 6–203(a) were mandatory and that *Fire–Rescue* did not establish a "sufficient cumulative information" standard. The judge further determined that the doctrine of offensive non-mutual issue preclusion did not apply because the parties in the instant case were not parties in the Anne Arundel County case and because the issues in each case were different. Finally, the judge reasoned that no matter what level of scrutiny applied to the enactments at issue, the enactments were not unconstitutional.

Petitioners noted an appeal to the Court of Special Appeals. Around the same time, Petitioners filed a petition for writ of

for Anne Arundel County seeking, *inter alia*, a declaratory judgment that the "sufficient cumulative information" standard was the correct standard for the State Board to apply when validating petition signatures. *Libertarian Party*, 426 Md. at 511–12, 44 A.3d at 1016. The Circuit Court judge in that case issued a declaratory judgment adopting the proposed "sufficient cumulative information" standard. *Libertarian Party*, 426 Md. at 491–92, 44 A.3d at 1004. Petitioners in the instant case argued in the Circuit Court for Frederick County that the determinations of law made by the trial judge in *Libertarian Party* bound Respondents through the doctrine of offensive non-mutual issue preclusion.

6. COMAR § 33.06.03.06B provides:
When signing the signature page, each signer shall:
(1) Sign the individual's name as it appears on the Statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and
(2) Provide the following information, to be printed or typed in the appropriate spaces:
(a) Date of signing,
(b) Signer's name as it was signed, and
(c) Current residence address, including house number, street name, apartment number (if applicable), town, and ZIP code.

certiorari, and Respondents filed a cross-petition and a Motion to Dismiss.[7] Prior to any proceedings in the intermediate appellate court, this Court issued a writ of *certiorari* to consider the issues presented in Petitioners' petition. We declined, however, to grant certiorari to consider the cross-petition, and we denied the Motion to Dismiss. *Burruss v. Bd. of Cnty. Comm'rs of Frederick Cnty.*, 424 Md. 54, 33 A.3d 981 (2011). We have rephrased the following questions[8] posed by Petitioners:

 1. Did the Frederick County Board of Elections apply the correct standard for reviewing and validating petition signa-

---

7. Respondents argued in their Motion to Dismiss that the cause of action was moot and that this Court was unable to grant the relief requested by Petitioners. Respondents contended that Md. Const. art. XI–A, § 1 A prescribes a very specific time frame during which the BOCC may call a special election for consideration of candidates not appointed to the charter board. According to Respondents, the special election must occur "not less than 30 or more than 90 days after receiving petitions." Because Respondents maintained that this time frame had expired on August 8, 2011, they asserted that this Court could not fashion a remedy consistent with the Maryland Constitution.

8. In their petition for writ of certiorari, Petitioners presented the following questions:
 1. Does the "sufficient cumulative information standard" forbid the invalidation of petition entries:
 -merely because the signer omits an unused first name or middle name, when writing his or her full name or signature; and
 -for name-related defects, if the entry contains address or birthdate information from which the signer's identity can be corroborated?
 If the answer to Question 1 is "no," the focus of this appeal will shift to the applicability of the doctrine of offensive non-mutual issue preclusion. Questions presented on that issue are:
 2. May offensive non-mutual issue preclusion be raised for the first time in an action for judicial review of an "administrative agency" decision if entry of the judgment having the preclusive effect occurred during the pendency of the action for judicial review?
 If the answer to Question 2 is "yes":
 3. For purposes of the application of offensive non-mutual issue preclusion concerning a matter of Maryland Election Law, is a local "Election Director" [and] "Chief Election Official" in privity with the "State Board" and the "State Administrator"?
 If the answer to Question 3 is "yes":
 4. Under the doctrine of offensive non-mutual issue preclusion, if Question 1 was actually litigated and determined by a valid and final judgment in an action in which the State Board and the State

tures under Md.Code (2002, 2010 Repl.Vol.), § 6–203(a) of the Election Law Article, as interpreted by the Court in *Fire–Rescue?*

2. In light of the declaratory judgment issued in the Circuit Court for Anne Arundel County, in the case of *Libertarian Party, et al. v. Md. State Bd. of Elections, et al.,* that the "sufficient cumulative information" standard is the correct standard to apply when validating and counting petition signatures, does the doctrine of offensive non-mutual collateral estoppel apply to preclude Respondents in the present case from relitigating that issue?

3. Do the signature validation requirements in § 6–203(a) and COMAR § 33.06.03.06B(1) violate the Maryland Constitution or the Maryland Declaration of Rights?

---

Administrator were parties, is the determination conclusive in a subsequent action in which a local Election Director [and] Chief Election Official is a party?
If the answer to Question 4 is "yes":
5. Does the pendency of an appeal affect the finality of a judgment for issue preclusion purposes?
If the answer to Question 5 is "no":
6. For purposes of offensive non-mutual issue preclusion concerning a matter of Maryland Election Law, is a Board of County Commissioners in privity with the State Board or the State Administrator?
If the answer to Question 6 is "no":
7. If a party to a subsequent action is bound by and precluded from relitigating an issue of law determined in an earlier action, does that party remain bound and precluded if a coparty in the subsequent action is not bound and precluded by the earlier action?
If Petitioners do not prevail on the above non-constitutional grounds, the focus of this appeal will shift to the appropriate level of scrutiny to apply to [Election Law Article] § 6–203(a)(1) [and] C.O.M.A.R. § 33.06.03.06.B(1). The questions presented on that issue are:
8. If the signatures on a petition for additional members of a county charter board are those of registered voters of the county and otherwise meet the numerical and authentication requirements set forth in Article XI–A, §§ 1 & 7 of the Constitution of Maryland but are invalidated for non compliance with [Election Law Article] § 6–203(a)(1) [and] C.O.M.A.R. § 33.06.03.06.B(1), what level of judicial scrutiny should apply to [Election Law Article] § 6–203(a)(1) [and] C.O.M.A.R. § 33.06.03.06.B(1)?
9. Do [Election Law Article] § 6–203(a)(1) [and] C.O.M.A.R. § 33.06.03.06.B(1) withstand the level of judicial scrutiny identified in the answer to Question [8] above?

In accordance with our recent opinion in *Md. State Bd. of Elections v. Libertarian Party*, 426 Md. 488, 44 A.3d 1002 (2012), we shall hold that the Board applied the correct standard for reviewing and validating petition signatures under § 6–203(a) of the Election Law Article, as interpreted by this Court in *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md. 697, 962 A.2d 342 (2008) and *Fire–Rescue*. Furthermore, we hold that the doctrine of collateral estoppel is not applicable to the circumstances of this case. Lastly, we hold that the mandatory petition signature requirements in § 6–203(a) and COMAR § 33.06.03.06B(1) are not unconstitutional.

## FACTUAL AND PROCEDURAL BACKGROUND

Article XI–A, § 1A of the Maryland Constitution provides that the board of county commissioners may appoint a charter board for the purpose of drafting and presenting a charter to the voters of the county. After appointing the charter board,

[i]f additional charter board members are nominated by petitions signed by three percent of the registered voters of the county or by two thousand registered voters, whichever is the lesser number, delivered to the board of county commissioners within sixty days after the charter board is appointed, the board of county commissioners shall call a special election not less than thirty or more than ninety days after receiving petitions, unless a regular election falls within the designated period.

Md. Const. art. XI–A, § 1A. Article XI–A, § 7 of the Maryland Constitution defines "petition" and grants the General Assembly certain powers in connection with petitions:

The word "Petition" as used in this Article means one or more sheets written or printed, or partly written and partly printed. There shall be attached to each paper of signatures filed with a petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the

address set opposite or below their names. The General Assembly shall prescribe by law the form of the petition, the manner for verifying its authenticity, and other administrative procedures which facilitate the petition process and which are not in conflict with this Article. The false signing of any name, or the signing of any fictitious name to said petition shall be forgery, and the making of any false affidavit in connection with said petition shall be perjury.

In accordance with the provisions of Article XI-A, § 7 of the Maryland Constitution, Title 6 of the Election Law Article provides a two-step process, involving validation and verification, for counting signatures on a petition.[9] The signature validation procedure is outlined in Md.Code (2002, 2010 Repl. Vol.), § 6-203 of the Election Law Article:

(a) *In general.*—To sign a petition, an individual shall:

(1) sign the individual's name as it appears on the state-wide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) include the following information, printed or typed, in the spaces provided:

(i) the signer's name as it was signed;

(ii) the signer's address;

(iii) the date of signing; and

(iv) other information required by regulations adopted by the State Board.

---

**9.** Md.Code (2002, 2010 Repl.Vol.), § 6-101(i) of the Election Law Article defines "petition" as:

[A]ll of the associated pages necessary to fulfill the requirements of a process established by the law by which individuals affix their signatures as evidence of support for:

(1) placing the name of an individual, the names of individuals, or a question on the ballot at any election;

(2) the creation of a new political party; or

(3) the appointment of a charter board under Article XI-A, § 1A of the Maryland Constitution.

(b) *Validation and counting.*—The signature of an individual shall be validated and counted if:

(1) the requirements of subsection (a) of this section have been satisfied;

(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;

(3) the individual has not previously signed the same petition;

(4) the signature is attested by an affidavit appearing on the page on which the signature appears;

(5) the date accompanying the signature is not later than the date of the affidavit on the page; and

(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.

COMAR § 33.06.03.06B was enacted for the purpose of implementing the petition signature validation procedures outlined in § 6–203(a):

When signing the signature page, each signer shall:

(1) Sign the individual's name as it appears on the Statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

(2) Provide the following information, to be printed or typed in the appropriate spaces:

(a) Date of signing,

(b) Signer's name as it was signed, and

(c) Current residence address, including house number, street name, apartment number (if applicable), town, and ZIP code.

The signature verification procedure is outlined in Md.Code (2002, 2010 Repl.Vol.), § 6–207 of the Election Law Article:

(a) *In general.*—(1) Upon the filing of a petition, and unless it has been declared deficient under § 6–206 of this subtitle, the staff of the election authority shall proceed to

verify the signatures and count the validated signatures contained in the petition.

(2) The purpose of signature verification under paragraph (1) of this subsection is to ensure that the name of the individual who signed the petition is listed as a registered voter.

(b) *State Board to establish process.*—The State Board, by regulation, shall establish the process to be followed by all election authorities for verifying and counting signatures on petitions.

In the instant case, the BOCC appointed a nine-member charter board on March 10, 2011. Petitioners subsequently circulated a petition to obtain the 2,000 signatures [10] necessary to nominate additional charter board members for consideration in a special election. On May 9, 2011, Petitioners submitted to the BOCC a petition nominating additional charter board members and purporting to contain 2,915 signatures of registered voters in Frederick County. Pursuant to § 6–203(a) and COMAR § 33.06.03.06B(1), the Board began the process of validating the submitted petition signatures. The Board determined that 1,742 petition signatures were valid, concluding that many of the entries were invalid due to signature defects such as an omitted first or middle name or initial. Because the petition did not contain a sufficient number of petition entries, as determined by the Board, the BOCC declined to call a special election for consideration of the nominated charter board members.

On May 20, 2011, Petitioners filed a Petition for Judicial Review in the Circuit Court for Frederick County, pursuant to Md.Code (2002, 2010 Repl.Vol.), § 6–209 of the Election Law

---

10. Md. Const. art. XI–A, § 1A provides that a petition to nominate additional charter board members must be signed by three percent of the registered voters in the county or two thousand registered voters, whichever is the lesser number. It does not appear to be disputed by the parties in the instant case that at the time when Petitioners circulated and submitted their petition for consideration of additional charter board members, two thousand registered voters was the lesser number in Frederick County.

Article. Petitioners claimed that, in accordance with this Court's opinion in *Fire–Rescue,* the correct standard for the Board to apply when validating signatures on a petition is the "sufficient cumulative information" standard. According to Petitioners, under that standard, a signature should be validated if there is sufficient cumulative information in the petition entry to identify the signer. Petitioners maintained that the legal determinations made by the Circuit Court for Anne Arundel County in *Libertarian Party, et al. v. Md. State Bd. of Elections, et al.*—namely, the trial judge's adoption of a "sufficient cumulative information" standard—bound Respondents in this case under the doctrine of offensive non-mutual issue preclusion. Lastly, Petitioners asserted that if the hearing judge declined to adopt a "sufficient cumulative information" standard or to apply offensive non-mutual issue preclusion, the judge should conclude that § 6–203(a) and COMAR § 33.06.03.06B(1) are unconstitutional.

Subsequently, Respondents filed a Motion to Dismiss or, in the Alternative, a Motion for Summary Judgment and a Request for a Hearing. The Motion was based on Respondents' claim that the Petition for Judicial Review failed to state a claim upon which relief could be granted. Respondents asserted that the time within which a special election could be called had passed; therefore, the action was moot and the court could not grant the relief requested by Petitioners. Respondents requested that, in the event the court decided to consider Petitioners' claims, the judge affirm the Board's determination that the petition submitted to the BOCC did not contain the requisite number of signatures to require the BOCC to call a special election. Petitioners thereafter answered Respondents' Motion and filed a Motion for Summary Judgment, seeking a declaratory judgment and a remand for the Board to evaluate the invalidated signatures under the alleged "sufficient cumulative information" standard.

A hearing was held on October 7, 2011, in the Circuit Court for Frederick County to consider the issues presented in the papers filed by the parties. The judge's Order, issued on the

same date, affirmed the determinations made by the Board in
its evaluation of the petition submitted by Petitioners. The
judge explained his reasoning in open court, stating that
collateral estoppel did not apply because Respondents were
not parties in the *Libertarian Party* case in Anne Arundel
County and the issues presented in both cases were different.
The judge also concluded that the requirements of § 6–203(a)
were mandatory and, therefore, the "sufficient cumulative
information" standard did not apply. Finally, the judge noted
that the purpose of the requirements in § 6–203(a) is to
prevent fraud and to ensure that petition signers are aware of
what they are signing. While the judge did not apply a
particular level of scrutiny in analyzing the constitutionality of
§ 6–203(a) and COMAR § 33.06.03.06B(1), he determined that
those enactments would withstand any level of scrutiny.

## DISCUSSION

### I. Requirements of § 6–203

██ The parties in this case offer substantially the same
arguments as those presented by the parties in *Md. State Bd.
of Elections v. Libertarian Party*, 426 Md. 488, 44 A.3d 1002
(2012) regarding interpretation of the phrase "sufficient cumu-
lative. information" in *Montgomery Cnty. Volunteer Fire–
Rescue Ass'n v. Montgomery Cnty. Bd. of Elections*, 418 Md.
463, 15 A.3d 798 (2011). Petitioners in this case claim that in
*Fire–Rescue*, this Court announced a new "sufficient cumula-
tive information" standard that State and local boards of
elections must employ in their validation of petition signatures
under § 6–203(a). In contrast to this position, Respondents
assert that Petitioners distort the Court's holding in *Fire–
Rescue*, and that the requirements of § 6–203(a) are mandato-
ry. As we stated recently in *Libertarian Party*, our interpre-
tation in *Doe v. Montgomery Cnty. Bd. of Elections*, 406 Md.
697, 962 A.2d 342 (2008) of the mandatory nature of § 6–203(a)
was not modified by our holding in *Fire–Rescue*. Rather,
*Fire–Rescue* merely addressed the issue of illegible petition
signatures. Thus, as stated correctly by the Circuit Court

judge in the present case, the petition signature requirements contained in § 6–203(a) are mandatory.

In *Libertarian Party*, we discussed the facts of *Doe*, which involved a petition for referendum to overturn a bill enacted by the Montgomery County Council to add gender identity as a protected characteristic under the County's anti-discrimination laws. *Doe*, 406 Md. at 702, 962 A.2d at 344–45. Several citizens in Montgomery County subsequently filed a Complaint, challenging the validity of the petition and seeking a declaratory judgment. *Doe*, 406 Md. at 703, 962 A.2d at 345. On review of the trial judge's grant of summary judgment, we determined that the words "shall" and "requirements" in § 6–203 reflected a mandatory directive that the signer must comply with all of the provisions of the statute. *Doe*, 406 Md. at 728, 962 A.2d at 360. We then discussed the facts and holding in *Fire–Rescue:*

> Several years after *Doe*, this Court decided *Fire–Rescue*. In *Fire–Rescue*, the Montgomery County Council signed into law a bill that established an emergency services transport fee. *Fire–Rescue*, 418 Md. at 466, 15 A.3d at 799–800. The Fire–Rescue Association thereafter sponsored a petition to challenge the bill through referendum. *Fire–Rescue*, 418 Md. at 466, 15 A.3d at 800. Following the Association's submission of petition entries, the County Board decided not to certify the petition because it did not contain the requisite number of valid signatures. *Fire–Rescue*, 418 Md. at 467, 15 A.3d at 800. The Association filed a Complaint for declaratory relief, challenging the County Board's refusal to certify the petition and place the referendum issue on the ballot. *Id.* In its Complaint, the Association objected to the Board's rejection of many entries based on legibility issues with the signatures in those entries. *Fire–Rescue*, 418 Md. at 468, 15 A.3d at 800–801. The trial court granted summary judgment in favor of the Board, "concluding that it had not acted arbitrarily or capriciously in rejecting illegible or partially legible signatures pursuant to the requirements of Maryland statutory and common law, particu-

larly this Court's decision in *Doe* [.]" *Fire–Rescue*, 418 Md. at 468, 15 A.3d at 801.

On review, we determined that the issue was primarily one of statutory construction. We made clear that we were addressing legibility of petition signatures—an issue that had not been discussed in *Doe*. *Fire–Rescue*, 418 Md. at 470–71, 15 A.3d at 802. We held that "§ 6–203(b)(1) directs the election authority to validate a petition signer's entry if there is sufficient cumulative information on the face of the petition, e.g., a signature, a printed name, address, date of signing, and other information required by regulation, evidencing compliance with § 6–203(a), to determine the identity of the signer." *Fire–Rescue*, 418 Md. at 473–74, 15 A.3d at 804. In other words, we cautioned that the Board should not stop the validation process merely because an illegible signature is present in a petition entry. *Fire–Rescue*, 418 Md. at 474, 15 A.3d at 804. We concluded, based on the Board's revised guidelines in light of *Doe*, that the Board "distort[ed] the purpose of § 6–203(a)(1)[, which] is to provide one element among many that the Board must use to satisfy the requirements of validation." *Fire–Rescue*, 418 Md. at 477, 15 A.3d at 806. Reiterating the fact that the purpose of the signature requirement in § 6–203(a)(1) is to provide a personal attestation to the information contained in the entry, we restated our conclusion in *Barnes* [*v. State ex rel. Pinkney*, 236 Md. 564, 204 A.2d 787 (1964),] "that the signature provided under § 6–203(a)(1) is but one of many pieces of identifying information that the Board must assess to determine the validity of a petition entry." *Fire–Rescue*, 418 Md. at 479–80, 15 A.3d at 807–08. (Footnote omitted.)

*Libertarian Party*, 426 Md. at 510–11, 44 A.3d at 1015–16.

■ With respect to the appellees' claims in *Libertarian Party* that *Fire–Rescue* established a new "sufficient cumulative information" standard, we stated:

In concluding that *Fire–Rescue* announced a new "sufficient cumulative information" standard with which to validate petition entries, the trial court misconstrued our hold-

ing in that case. The issue before us in *Fire–Rescue* was legibility of petition signatures and whether the County Board had properly construed § 6–203 to require legible signatures in order to validate referendum petition entries. We did not, explicitly or implicitly, overrule our holding in *Doe* that the requirements of § 6–203(a) are mandatory. Appellees' argument and the trial court's reasoning take the "sufficient cumulative information" language out of context. In context, we merely stated that an illegible signature, alone, should not, pursuant to the plain language and meaning of the statute, result in the Board's refusal to validate a petition entry. Rather, if there is an illegible signature, the Board should continue to engage in the validation process by determining whether the petition entry satisfies all of the requirements under § 6–203(a).

*Libertarian Party*, 426 Md. at 513–14, 44 A.3d at 1017. Thus, in accordance with our holding in Libertarian Party, we reaffirm that the requirements for validation of petition signatures in § 6–203(a), applicable to charter board nominating petitions, are mandatory.

## II. Offensive Non–Mutual Collateral Estoppel

The Circuit Court judge in the present case determined that the doctrine of offensive non-mutual collateral estoppel was not applicable because Respondents were not parties in the *Libertarian Party* case and because the issues in this case are different than those litigated in *Libertarian Party*. While we decline to comment on those legal determinations, we affirm the judge on the ground that this Court has not yet embraced the offensive use of non-mutual collateral estoppel, and we decline to do so under the circumstances in this case.

In *Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977), we outlined a four-part test that must be satisfied for the doctrine of collateral estoppel to apply:

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?

2. Was there a final judgment on the merits?

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?

4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

We explained in *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 516, 555 A.2d 486, 489 (1989), that traditional collateral estoppel, or issue preclusion, requires mutuality of parties. Thus, under the traditional doctrine, only in a second suit *between the same parties* will a determination of fact or law that was actually litigated and was essential to a valid and final judgment be conclusive. *See id.* Some courts have modified the requirement that mutuality of parties is necessary in order to apply the doctrine of collateral estoppel. In other words, some courts have decided to preclude "in an action between A and B, relitigation of an issue decided in an earlier case to which either A or B, but not both, was a party." *Rourke v. Amchem Prods., Inc.*, 384 Md. 329, 341, 863 A.2d 926, 933 (2004). In such a situation, if the plaintiff in the second case seeks to foreclose the defendant from relitigating an issue that the defendant, or a party in privity with the defendant, previously defended unsuccessfully in another action against one or more different parties, the doctrine invoked is *offensive* non-mutual collateral estoppel. *See id.* If, on the other hand, the defendant seeks to preclude the plaintiff from relitigating an issue that the plaintiff, or a party in privity with the plaintiff, previously litigated unsuccessfully in another action against one or more different parties, the doctrine is referred to as *defensive* non-mutual collateral estoppel. *See id.*

In *Libertarian Party*, we were confronted with the issue of whether the Maryland State Board of Elections should apply a "sufficient cumulative information" standard in validating petition signatures under § 6–203(a). *Libertarian Party*, 426 Md. at 511–12, 44 A.3d at 1016. In the Circuit Court for Anne Arundel County, where the Libertarian Party and Green Party filed suit against the Maryland State Board of Elections, the trial judge granted summary judgment in favor of the Libertarian Party and Green Party, issuing a declaratory

judgment adopting their suggested "sufficient cumulative information" standard. *Libertarian Party,* 426 Md. at 491–92, 44 A.3d at 1004. The trial judge concluded, *inter alia,* that petition signatures should not be invalidated merely for containing name-related defects when the signer has provided sufficient cumulative information in the petition entry to identify him or her as a registered voter. *Libertarian Party,* 426 Md. at 504–05, 44 A.3d at 1011–12.

■ When the trial judge in *Libertarian Party* made his ruling, Petitioners in the instant case had filed their Petition for Judicial Review in the Circuit Court for Frederick County. The judge in the case *sub judice* declined to apply the doctrine of offensive non-mutual collateral estoppel to essentially bind Respondents—the BOCC, the Frederick County Board of Elections, and Stuart Harvey—to the legal determinations made by the trial judge in *Libertarian Party.* Petitioners claim, however, that the judge, in the case at bar, acted in error. According to Petitioners, the issue in the present case is the same as the issue litigated in *Libertarian Party;* there was a final judgment on the merits in Libertarian Party; the Maryland State Board of Elections is in privity with the Frederick County Board of Elections and Stuart Harvey, in his capacity as Election Director and Chief Election Official; and the State Board was given a fair opportunity to be heard at the trial court level in *Libertarian Party.* Thus, Petitioners assert:

> All requirements for the application of offensive non-mutual issue preclusion having been satisfied, [we] contend that [Respondents are] bound by, and [are] precluded from relitigating, the issue of law determined in the Anne Arundel County action, namely, that the sufficient cumulative information standard forbids the invalidation of petition entries: [ (1) ] merely because the signer omits an unused first name or middle name, when writing his or her full name or signature; and [ (2) ] for name-related defects, if the entry contains address or birthdate information from which the signer's identity can be corroborated.

■ We decline the invitation to apply the doctrine of collateral estoppel to the circumstances of this case. In *Rourke*, we acknowledged that this Court has recognized the doctrine of defensive non-mutual collateral estoppel. *Rourke*, 384 Md. at 349, 863 A.2d at 938. We explained in that case that the United States Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), declined to embrace the doctrine of offensive non-mutual collateral estoppel. *Rourke*, 384 Md. at 349–50, 863 A.2d at 938. This Court has not, since we issued our opinion in *Rourke*, adopted or applied the doctrine of offensive non-mutual collateral estoppel, and we deem the Supreme Court's analysis in *Parklane* persuasive. In *Parklane*, the Supreme Court noted that offensive use of non-mutual collateral estoppel may be unfair "if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant." *Parklane*, 439 U.S. at 330, 99 S.Ct. at 651, 58 L.Ed.2d at 562. In the instant case, Petitioners rely upon the declaratory judgment issued in the Circuit Court for Anne Arundel County that a "sufficient cumulative information" standard applies in the validation of petition signatures. Even assuming that all the elements of non-mutual collateral estoppel are satisfied, in this case, the judgment entered in the Circuit Court for Anne Arundel County is inconsistent with this Court's holdings in *Doe* and *Fire–Rescue* that the signature requirements of § 6–203(a) are mandatory—the interpretation asserted by Respondents in the present case. It would be unfair to bind Respondents to an incorrect interpretation of the law, as determined by another trial court, that could have been, and should have been, interpreted correctly by that trial court. Furthermore, this Court's recent holding in *Libertarian Party* reaffirmed that the petition signature requirements in § 6–203(a) are mandatory, and it would be unfair to bind Respondents to an interpretation of the law inconsistent with our holding in that case. Therefore, we decline to adopt the doctrine of offensive non-mutual collateral estoppel in the case *sub judice*.

## III. Constitutional Claims

 In their alternative argument, Petitioners contend that if we conclude that the "sufficient cumulative information" standard is not the correct standard for the Board to apply when validating petition signatures under § 6–203(a) and that the doctrine of offensive non-mutual issue preclusion is not applicable to the circumstances of this case, then this Court should apply strict scrutiny to § 6–203(a) and COMAR § 33.06.03.06B(1) and determine that those provisions are unconstitutional. In accordance with Maryland case law, we first consider, in a realistic light, the extent and nature of the burden placed upon voters when determining what level of scrutiny to apply to a constitutional challenge that implicates voting and associational rights. *See Nader for President 2004 v. Md. State Bd. of Elections,* 399 Md. 681, 697, 926 A.2d 199, 208–09 (2007); *Md. Green Party v. Md. Bd. of Elections,* 377 Md. 127, 163, 832 A.2d 214, 235 (2003); *Bd. of Supervisors of Elections of Prince George's Cnty. v. Goodsell,* 284 Md. 279, 287, 396 A.2d 1033, 1037 (1979). The burden placed on the voters of Frederick County, *i.e.,* printing and signing one's own name in accordance with the relevant enactments, is minimal. Therefore, we apply rational basis scrutiny, and we hold that the provisions at issue are constitutional because they are reasonable, nondiscriminatory measures designed to further the State's important purposes of preventing fraud and identifying the signers of a petition. Furthermore, we hold that § 6–203(a) and COMAR § 33.06.03.06B(1) are not inconsistent with Article XI–A, §§ 1A and 7 of the Maryland Constitution.

Petitioners contend that § 6–203(a) and COMAR § 33.06.03.06B(1) violate Articles 7 and 24 of the Maryland Declaration of Rights, and that those enactments are inconsistent with Article XI–A, §§ 1 A and 7 of the Maryland Constitution. In maintaining that this Court "places the nominating petition process on the same high plane as the right to vote," Petitioners claim that the challenged enactments should be subjected to strict scrutiny. Relying on the Maryland cases of *Goodsell, Green Party,* and *Nader,* Petitioners assert that the

impact of the enactments at issue in the instant case on the voters of Frederick County is substantial. Thus, according to Petitioners, this Court should, as we did in those cases just mentioned, apply strict scrutiny to the requirements imposed on the charter board nominating petition process and determine that the enactments are unconstitutional. Furthermore, Petitioners assert that the enactments are inconsistent with Article XI–A, §§ 1 A and 7 of the Maryland Constitution because a proposed amendment to Article XI–A, § 7, granting the General Assembly the power to establish requirements as to the "adequacy" of petition signatures, as opposed to "verifying the authenticity" of a petition, was considered and expressly rejected. Claiming that restrictions relating to "adequacy" and "authenticity" have different meanings and purposes, Petitioners contend that a statutory or regulatory requirement that a properly authenticated signature be adequate "is beyond the scope of the power and authority delegated by Art. XI–A, § 7[.]"

Respondents claim that, contrary to Petitioners' assertions, § 6–203(a) and COMAR § 33.06.03.06B(1) withstand any heightened level of constitutional scrutiny. Respondents rely on the Court of Special Appeals case of *Howard Cnty. Citizens for Open Gov't v. Howard Cnty. Bd. of Elections*, 201 Md.App. 605, 30 A.3d 245 (2011), for their contention that the provisions at issue are not in conflict with the Maryland Constitution and that they are reasonable, nondiscriminatory enactments. Additionally, Respondents maintain that Petitioners have failed to produce any evidence of how the relevant regulations and statutory provisions substantially impact or burden their ability or opportunity to elect a charter board. Rather, Respondents cite *Doe* for the proposition that "[i]f this Court in *Doe* determined that it is not too burdensome to sign a petition for a referendum, then surely it is not too burdensome to sign a petition for a charter board special election."

In *Bd. of Supervisors of Elections of Prince George's Cnty. v. Goodsell*, 284 Md. 279, 281, 396 A.2d 1033, 1034 (1979), Vincent Goodsell filed a certificate of candidacy for the office of County Executive for Prince George's County. The Board

of Supervisors of Elections for Prince George's County (the Board) refused to accept Goodsell's certificate or place his name on the ballot, claiming that Goodsell failed to meet the qualifications of § 405 of Art. IV of the Prince George's County Charter, which provided, in relevant part, that "[t]he County Executive shall have been a qualified voter of Prince George's County for at least five years immediately preceding his election." *Id.* At the time Goodsell attempted to run for office, he had been a registered voter of Prince George's County for only two years. *Id.* He had otherwise satisfied all requirements related to the office for which he sought consideration. *Id.* The Circuit Court for Prince George's County decided the issue by interpreting the challenged provision of the Prince George's County Charter. *Goodsell,* 284 Md. at 282, 396 A.2d at 1034–35. Accordingly, it did not address Goodsell's equal protection claim. *Goodsell,* 284 Md. at 282, 396 A.2d at 1035.

On review in this Court, in addition to addressing the issue of the proper interpretation of the relevant charter provision, we also addressed Goodsell's equal protection argument. We stated, "The first step in dealing with a contention that a particular classification denies to members of one class the equal protection of the laws is to determine the appropriate standard for reviewing the classification." *Goodsell,* 284 Md. at 286, 396 A.2d at 1036–37 (citations omitted). We proceeded to analogize the facts before us in *Goodsell* to those in *Henderson v. Fort Worth Independent Sch. Dist.,* 526 F.2d 286 (5th Cir.1976). In *Henderson,* the Court of Appeals for the Fifth Circuit determined that a Texas law that required candidates for the Fort Worth school board to be qualified voters in the district for a period of three years was subject to strict scrutiny, based on the extent and nature of the impact on voters, considered in a realistic light. *Henderson,* 526 F.2d at 289, 291–92. Taking into consideration the court's analysis in *Henderson* regarding the impact on voters of a statutory requirement that potential candidates be registered voters in a certain location for a certain period of time, we posited in *Goodsell* that "[i]f a three year registration requirement for

local office has a substantial impact upon voter choice as held in the *Henderson* case, it follows that a five year requirement like the one in the case at bar will have an even greater impact." *Goodsell*, 284 Md. at 288, 396 A.2d at 1038. Because we determined that the impact on voter choice was substantial, we applied the strict scrutiny test, which requires the party against whom a challenge is brought to show that the enactment at issue "is reasonably necessary to the accomplishment of legitimate governmental objectives." *Goodsell*, 284 Md. at 289, 396 A.2d at 1038–39 (internal quotation omitted). We held that the registration requirement was discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment and Article 23 of the Maryland Declaration of Rights. *Goodsell*, 284 Md. at 292–93, 396 A.2d at 1040.

In determining which level of scrutiny to apply in *Goodsell*, we sought guidance from the United States Supreme Court case of *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). In *Bullock*, the Supreme Court addressed the constitutionality of a Texas law that required a candidate to pay a substantial filing fee to have his or her name placed on the ballot in a primary election. *Bullock*, 405 U.S. at 135, 92 S.Ct. at 852, 31 L.Ed.2d at 95. Under the Texas statutory scheme, there was no procedure, other than paying the required filing fee, by which a candidate could get on the primary ballot. *Bullock*, 405 U.S. at 137, 92 S.Ct. at 852–53, 31 L.Ed.2d at 96. Several prospective candidates for local office challenged the statutory scheme under the Equal Protection Clause of the Fourteenth Amendment. *Bullock*, 405 U.S. at 140–41, 92 S.Ct. at 854–55, 31 L.Ed.2d at 98. While noting that the direct impact of the filing fee law was felt by potential candidates for office, the Supreme Court stated that "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock*, 405 U.S. at 142–43, 92 S.Ct. at 855–56, 31 L.Ed.2d at 99. Importantly, the Supreme Court asserted that "not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review."

*Bullock,* 405 U.S. at 143, 92 S.Ct. at 856, 31 L.Ed.2d at 99 (citing *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802 807–08, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739, 745 (1969)). Acknowledging that the Texas statute at issue created barriers to candidate access to the primary ballot, the Supreme Court recognized that "[t]he existence of such barriers does not of itself compel close scrutiny." *Bullock,* 405 U.S. at 143, 92 S.Ct. at 856, 31 L.Ed.2d at 100 (citations omitted). Rather, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Id.* The Supreme Court determined that the effect of the statutory provision at issue on voters was "neither incidental nor remote." *Bullock,* 405 U.S. at 143–44, 92 S.Ct. at 856, 31 L.Ed.2d at 100. It, therefore, subjected the statute to strict scrutiny and held that it was a denial of the equal protection of the law. *Bullock,* 405 U.S. at 149, 92 S.Ct. at 859, 31 L.Ed.2d at 103.

The United States Supreme Court decided the case of *Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), several years after this Court's opinion in *Goodsell.* In *Burdick,* the Supreme Court addressed the issue of whether Hawaii's prohibition on write-in voting unreasonably infringed upon voters' rights under the First and Fourteenth Amendments. *Burdick,* 504 U.S. at 430, 112 S.Ct. at 2061, 119 L.Ed.2d at 251. The Supreme Court noted that while voting was an important fundamental right, "[i]t does not follow ... that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063, 119 L.Ed.2d at 252–53 (citation omitted). Recognizing that every election law will invariably impose some burden upon voters, the Supreme Court asserted that "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest ... would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick,* 504 U.S. at 433, 112 S.Ct. at 2063, 119 L.Ed.2d at 253. The Supreme Court determined that the appropriate analysis of a challenge to a

state election law involved weighing "the character and magnitude of the asserted injury" to the protected constitutional rights against the interests put forth by the State, taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063, 119 L.Ed.2d at 253 (quotations and citations omitted). Thus, the propriety of the challenged enactment depends upon the extent of the burden imposed. *Id.* Accordingly, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063, 119 L.Ed.2d at 254 (quotations and citations omitted). With those considerations in mind, the Supreme Court determined that any burden placed on voters by Hawaii's ban on write-in ballots was very limited. *Burdick*, 504 U.S. at 437, 112 S.Ct. at 2065, 119 L.Ed.2d at 255. Ultimately, the Supreme Court held that "when a State's ballot access laws pass constitutional muster as imposing only reasonable burdens on First and Fourteenth Amendment rights—as do Hawaii's election laws—a prohibition on write-in voting will be presumptively valid, since any burden on the right to vote for the candidate of one's choice will be light and normally will be counterbalanced by the very state interests supporting the ballot access scheme." *Burdick*, 504 U.S. at 441, 112 S.Ct. at 2067, 119 L.Ed.2d at 258.

In *Md. Green Party v. Md. Bd. of Elections*, 377 Md. 127, 136, 832 A.2d 214, 219 (2003), the Green Party sought to nominate a candidate for the November 2000 election for the United States House of Representatives in Maryland's first congressional district. The Green Party had been required to submit a petition bearing the signatures of at least 10,000 registered Maryland voters to qualify as a recognized political party, in accordance with Md.Code (1957, 1997 Repl.Vol.), § 4–102(b)(2)(i) of the Election Law Article. *Green Party*, 377 Md. at 135–36, 832 A.2d at 219. In order to place a candidate on the ballot in the November 2000 election, the Green Party was

required to submit a second petition signed by at least 1% of registered voters in Maryland's first congressional district. *Green Party*, 377 Md. at 136–37, 832 A.2d at 219–20. After the Green Party submitted the second petition, the Board determined that it did not contain valid signatures of at least 1% of registered voters in the requisite geographic area. *Green Party*, 377 Md. at 137, 832 A.2d at 220. The Board asserted that many of the petition signatures were rejected because the signers were inactive voters. *Id.*

On review in this Court, we limited our evaluation of the constitutionality of the challenged statutory provisions to a consideration of Article I of the Maryland Constitution and Articles 7 and 24 of the Maryland Declaration of Rights. *Green Party*, 377 Md. at 139, 832 A.2d at 221. Title 1 of the Election Code, § 1–101(gg) excluded from the definition of "registered voter" individuals whose names appeared on the inactive voter registry. *See Green Party*, 377 Md. at 145, 832 A.2d at 225. In addition, § 3–504(f) provided, in relevant part, that "[i]ndividuals whose names have been placed on the inactive list may not be counted as part of the registry" and "[r]egistrants placed on the inactive list shall be counted only for purposes of voting and not for official administrative purposes as petition signature verification...." *See Green Party*, 377 Md. at 149–50, 832 A.2d at 227. We determined that those statutory provisions created a group of second-class citizens in violation of Article I of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights. *Green Party*, 377 Md. at 150, 832 A.2d at 227. In explaining our reasoning, we stated that the Maryland Constitution sets forth the exclusive qualifications and restrictions for voting in Maryland, and "[t]he Legislature may not impose additional qualifications or restrictions by requiring voters to cast their votes frequently ... [n]or may the Board regulate the registry to effect such unconstitutional ends." *Green Party*, 377 Md. at 152, 832 A.2d at 229.

In *Green Party*, we also evaluated the constitutionality of the Election Code's two-tiered petitioning requirement for political parties, concluding that, in a realistic light, that

requirement imposed a substantial impact on voters by denying ballot access to a significant number of minor political party candidates. *Green Party,* 377 Md. at 163, 832 A.2d at 235. In accordance with that conclusion, we evaluated the challenged provision under strict scrutiny and determined that it discriminated against minor political parties and their candidates in violation of the equal protection component of Article 24 of the Maryland Declaration of Rights. *Green Party,* 377 Md. at 163–65, 832 A.2d at 235–36. We cited in support of our analysis the United States Supreme Court case of *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). In that case, Anderson sought placement as an independent candidate for President on the ballot in the November 1980 general election. *Anderson,* 460 U.S. at 782, 103 S.Ct. at 1566, 75 L.Ed.2d at 553. Despite meeting all of the substantive requirements, Anderson failed to satisfy Ohio's early filing deadline. *Id.* On review, the Supreme Court considered whether the early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters. *Id.* Although the direct impact of Ohio's statutory scheme fell upon aspirants for office, the Supreme Court reiterated the principle, expressed in *Bullock,* that laws affecting candidates always have some correlative effect on voters. *Anderson,* 460 U.S. at 786, 103 S.Ct. at 1568, 75 L.Ed.2d at 556. Therefore, in determining the appropriate level of scrutiny to apply to such laws, the Supreme Court concluded that it was important to consider the restrictions in a realistic light, given the nature and extent of the impact the restrictions had on voters. *Anderson,* 460 U.S. at 786, 103 S.Ct. at 1569, 75 L.Ed.2d at 556.

The Supreme Court in *Anderson* noted that although the voting and associational rights of citizens are fundamental, "not all restrictions imposed by the States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates." *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569, 75 L.Ed.2d at 557. Accordingly, a "State's important regulatory interests are generally sufficient to justify reasonable, nondis-

criminatory restrictions." *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557. The Supreme Court began its analysis of the constitutionality of the challenged statute by noting that there is no "litmus–paper test that will separate valid from invalid restrictions." *Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d at 558. Rather, the analytical process involves a consideration of the "character and magnitude of the asserted injury" to constitutional rights, weighed against the interests asserted by the State in justification of the burdens imposed by the statute in question. *Id.* The Supreme Court determined that the Ohio filing deadline placed "a significant state-imposed restriction on a nationwide electoral process." *Anderson,* 460 U.S. at 795, 103 S.Ct. at 1573, 75 L.Ed.2d at 562. After evaluating the State's claimed interests underlying the statutory scheme at issue, the Supreme Court determined that those interests were insufficient to overcome the burden placed on voters, holding that "[u]nder any realistic appraisal, the 'extent and nature' of the burdens Ohio has placed on the voters' freedom of choice and freedom of association, in an election of nationwide importance, unquestionably outweigh the State's minimal interest in imposing a March deadline." *Anderson,* 460 U.S. at 806, 103 S.Ct. at 1579, 75 L.Ed.2d at 569.

*Nader for President 2004 v. Md. State Bd. of Elections,* 399 Md. 681, 683, 926 A.2d 199, 200 (2007), dealt with the sufficiency of a petition submitted by Nader for President 2004 and the Populist Party (collectively, the appellants) for the purpose of forming a new political party and nominating Ralph Nader for President of the United States. After evaluating the petition filed by the appellants, the State Board of Elections determined that it did not fulfill the statutory requirement of containing 10,000 signatures of registered voters; therefore, the Board refused to place Nader on the ballot in the 2004 Presidential Election. *Nader,* 399 Md. at 683–84, 926 A.2d at 200–01. The sole issue before this Court on review was the propriety of the Board's determination to invalidate petition signatures merely because a signer of the petition was registered in a county other than the county specified on the sheet

he or she signed, resulting in a "wrong county" classification. *Nader*, 399 Md. at 684, 926 A.2d at 201.

In order to be recognized as a new political party in the State of Maryland, a political organization must submit a petition to the State Board containing the signatures of at least 10,000 registered Maryland voters, in accordance with § 4–102 of the Election Law Article. *See Nader*, 399 Md. at 688, 926 A.2d at 203. Pursuant to Md.Code (2002, 2003 Repl.Vol.), § 6–203(b)(2) of the Election Law Article, if the signatory is not a registered voter in the county specified on the signature page of the petition that bears his or her signature, the State Board will not validate or count the signature. *See Nader*, 399 Md. at 689, 926 A.2d at 204. We began our analysis of that statutory provision, and the corresponding regulations in COMAR,[11] by noting that "[i]t is a well settled principle that a State Legislature may not enact laws that are in derogation of the Constitution." *Nader*, 399 Md. at 696, 926 A.2d at 208 (internal quotation and citations omitted). We then considered whether the alleged disenfranchisement of voters caused by the enactments at issue violated Article I of the Maryland Constitution and Articles 7 and 24 of the Maryland Declaration of Rights by examining, in a realistic light, the nature and extent of the impact of those enactments on voters. *Nader*, 399 Md. at 697, 926 A.2d at 208–09. We disagreed with the Circuit Court's application of a rational basis test, reasoning that "the impact on both the voters in this State and on the Party to be recognized, and, thus, the presidential candidate it nominates, is substantial." *Nader*, 399 Md. at 698–99, 926 A.2d at 209. We, therefore, determined that the State Board was required to show "that the 'county-match' requirement in [Election Law Article] § 6–203(b)(2) is 'reasonably necessary to the accomplishment of

---

11. COMAR § 33.06.05.01A provides: "For a petition filed with the State Board, the State Administrator shall transmit to the election director of each county, for verification under this chapter, all of the signature pages that, in accordance with COMAR 33.06.04.03, the sponsor designated as containing the names of individuals residing in that county."

legitimate government objectives, . . . or necessary to promote a compelling government interest.'" *Nader,* 399 Md. at 699, 926 A.2d at 209 (quoting *Green Party,* 377 Md. at 163, 832 A.2d at 235). Analyzing the statutory provision at issue under strict scrutiny, we concluded that the "county-match" requirement was unduly burdensome to both the signers of the petition and the Party circulating the petition; thus, we held that "the disenfranchisement of voters solely based on a 'county-match' requirement is inconsistent with Article I of the Maryland Constitution, as well as with Articles 7 and 24 of the Maryland Declaration of Rights." *Nader,* 399 Md. at 708, 926 A.2d at 215.

■ Our analysis in the case *sub judice* is limited to a discussion of whether the challenged enactments violate either the Maryland Constitution or the Maryland Declaration of Rights. We need not, and do not, address any arguments based on the Federal Constitution. *See Green Party,* 377 Md. at 139, 832 A.2d at 221; *Dua v. Comcast Cable,* 370 Md. 604, 618 n. 6, 805 A.2d 1061, 1069–70 n. 6 (2002) (noting that "by not reaching the federal constitutional issues, we do not suggest the result in [these] case[s] would be any different if the sole issue were whether the [statutes] violated the federal Constitution. We simply are making it clear that our decision is based exclusively upon [the Maryland Constitution] and is in no way dependent upon the federal [Constitution]" (internal quotations and citations omitted)); *Perry v. State,* 357 Md. 37, 86 n. 11, 741 A.2d 1162, 1188 n. 11 (1999). We begin our analysis with the premise that there is a strong presumption of constitutionality enjoyed by State statutes. *Koshko v. Haining,* 398 Md. 404, 426, 921 A.2d 171, 183 (2007); *Md. State Bd. of Educ. v. Bradford,* 387 Md. 353, 387, 875 A.2d 703, 723 (2005) (holding that "[d]eclaring a statute enacted by the General Assembly to be unconstitutional and therefore unenforceable is an extraordinary act. Statutes are generally presumed to be constitutional and are not to be held otherwise unless the Constitutional impediment is clear"). Thus, "a party challenging the facial validity of a statute must establish that no set of circumstances exist under which the Act would

be valid." *Koshko,* 398 Md. at 426, 921 A.2d at 184 (internal quotation omitted).

We first address Petitioners' contention that § 6–203(a) and COMAR § 33.06.03.06B(1) violate Articles 7 and 24 of the Maryland Declaration of Rights and are, thus, unconstitutional. Article 7 of the Declaration of Rights provides: "That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose, elections ought to be free and frequent; and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage." Article 24 of the Declaration of Rights provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Consistent with Maryland case law, the first step in our analysis of a constitutional challenge such as the one presented by Petitioners is to determine, in a realistic light, the extent and nature of the burden imposed on voters by the challenged enactments. *See Nader,* 399 Md. at 697, 926 A.2d at 208–09 (maintaining that "because this case involves the rights, and possible disenfranchisement, of hundreds of Maryland voters, this Court must examine, in a realistic light[,] the extent and nature of [the] impact ... on [those] voters" (internal quotation and citations omitted)); *Green Party,* 377 Md. at 163, 832 A.2d at 235; *Goodsell,* 284 Md. at 287, 396 A.2d at 1037. As we stated in *Doe v. Montgomery Cnty. Bd. of Elections,* 406 Md. 697, 732 n. 28, 962 A.2d 342, 363 n. 28 (2008), in the context of referendum petitions, "the mandatory signature requirements of Section 6–203(a)(1) are not unduly burdensome, requiring a signer to provide only a surname, one full given name, the initials of any other names, the signer's address and date of signing." The burden imposed on voters by § 6–203(a) and COMAR § 33.06.03.06B(1) is equally minimal in the context of petitions circulated for the purpose of nominating additional local charter board members. There-

fore, we apply the rational basis test in evaluating whether the enactments pass constitutional muster.

■■■ We recognized in *Doe* that the signature requirements in § 6–203(a), which are mirrored in COMAR § 33.06.03.06B(1), " 'provide additional means by which fraudulent or otherwise improper signatures upon a referendum petition may be detected.' " *Doe*, 406 Md. at 733, 962 A.2d at 363 (quoting *Barnes v. State ex rel. Pinkney*, 236 Md. 564, 571–72, 204 A.2d 787, 793 (1964)). The same important State purpose is served by imposing those signature requirements on charter board nominating petitions. In accordance with relevant case law, our analysis will be guided by whether the challenged enactments are reasonable, nondiscriminatory measures to implement the Board's purposes. *See Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063, 119 L.Ed.2d at 254 (declaring that "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon . . . voters, the State's important regulatory interests are generally sufficient to justify the restrictions" (quotations and citations omitted)); *Anderson*, 460 U.S. at 788, 103 S.Ct. at 1570, 75 L.Ed.2d at 557 (concluding that a "State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions"). The signature requirements contained in the challenged enactments apply equally to all charter board nominating petition signers, and the requirements provide a reasonable means by which the Board can attempt to prevent fraud in petition signing and efficiently identify and validate the signers. Therefore, we hold that § 6–203(a) and COMAR § 33.06.03.06B(1) are reasonable, nondiscriminatory enactments that do not violate Articles 7 and 24 of the Maryland Declaration of Rights.

Next, we address the claim that § 6–203(a) and COMAR § 33.06.03.06B(1) are inconsistent with Article XI–A, §§ 1A and 7 of the Maryland Constitution. Section 1A describes the process by which registered voters may nominate additional charter board members by submitting a petition to the board of county commissioners containing the required number of

signatures. Section 7 defines the term "petition" and provides:

> The word "Petition" as used in this Article means one or more sheets written or printed, or partly written and partly printed. There shall be attached to each paper of signatures filed with a petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona fide and that the signers are registered voters at the address set opposite or below their names. The General Assembly shall prescribe by law the form of the petition, the manner for verifying its authenticity, and other administrative procedures which facilitate the petition process and which are not in conflict with this Article. The false signing of any name, or the signing of any fictitious name to said petition shall be forgery, and the making of any false affidavit in connection with said petition shall be perjury.

In *Barnes v. State ex rel. Pinkney*, 236 Md. 564, 204 A.2d 787 (1964), we analyzed whether Section 169, Article 33 of the Maryland Code (1957, 1964 Supp.), the precursor to § 6–203(a), was inconsistent with Article XVI, § 4 of the Maryland Constitution, which governs certain aspects of the rights of voters with respect to referendum initiatives. At the time we decided *Barnes*, Section 169 read, in relevant part:

> In every petition (including an associated or related set of petitions) under the provisions of Article XVI of the State Constitution, there shall be appended to the signature of each signer his residence, the precinct or district wherein he is registered as a voter, and immediately below the signature of any such signer, there shall be either printed or typed, the name of such signer.

*See Barnes*, 236 Md. at 569, 204 A.2d at 789–90. Article XVI, § 4 provided the following language with regard to petitions:

> A petition may consist of several papers, but each paper shall contain the full text of the Act or part of Act petitioned upon; and there shall be attached to each such paper an

affidavit of the person procuring the signatures thereon that of the said person's own personal knowledge every signature thereon is genuine and bona fide, and that the signers are registered voters of the State of Maryland, and of the City of Baltimore, or County, as the case may be, as set opposite their names, and no other verification shall be required.

*See Barnes,* 236 Md. at 569, 204 A.2d at 789. We concluded that the statutory signature requirements at issue pertained only to the identification of the signer. *Barnes,* 236 Md. at 571, 204 A.2d at 791. In our view, the requirements did not "affect the Constitutional provision with respect to the affidavit of the person who procured the signatures, except insofar as they may provide means of checking the truth of the affidavit." *Id.* We determined that Article XVI, § 4 would "be furthered if, by proper and reasonable means, a referendum petition is to be put upon the ballot only if it has the requisite number of genuine signatures of registered voters." *Id.* Thus, we held that "the statutory provisions [were] not in conflict with Section 4 of Article XVI of the Constitution . . . [and] that [those] provisions [were] reasonable and constitute[d] proper legislative enactments in furtherance of and not in conflict with the purposes of the Article." *Id.*

The Court of Special Appeals confronted, in *Howard Cnty. Citizens for Open Gov't v. Howard Cnty. Bd. of Elections,* 201 Md.App. 605, 30 A.3d 245 (2011), the issue of whether § 6–203(a), in its current form, conflicts with Article XVI, § 4. Section 4 was amended in 1982, and its current language closely mirrors the language in Article XI–A, § 7, pertaining to charter board nominating petitions:

A petition may consist of several papers, but each paper shall contain the full text, or an accurate summary approved by the Attorney General, of the Act or part of Act petitioned. There shall be attached to each paper of signatures filed with a petition an affidavit of the person procuring those signatures that the signatures were affixed in his presence and that, based upon the person's best knowledge and belief, every signature on the paper is genuine and bona

fide and that the signers are registered voters at the address set opposite or below their names. The General Assembly shall prescribe by law the form of the petition, the manner for verifying its authenticity, and other administrative procedures which facilitate the petition process and which are not in conflict with this Article.

*See Citizens for Open Gov't,* 201 Md.App. at 618 n. 14, 30 A.3d at 253 n. 14. The intermediate appellate court noted that a significant change between § 6–203(a) in its current form and the form of the statute when it was evaluated in *Barnes,* is that the statute now requires a petition signature to either match the signer's name on the voter registration list or contain the signer's surname, at least one full given name, and the initials of any other names. *Citizens for Open Gov't,* 201 Md.App. at 625, 30 A.3d at 257. The current form of the statute also omits the requirement that a signer identify his or her voting precinct. *Id.* The court concluded that the statutory signature requirements were "not inconsistent with Article XVI § 4 because the constitutional provision addresses only the form and contents of the affidavit to be signed by the person procuring the signatures on the petition sheet." *Citizens for Open Gov't,* 201 Md.App. at 625, 30 A.3d at 257–58. Relying on this Court's opinions in *Barnes* and *Doe,* the Court of Special Appeals maintained that "[t]aken as a whole, § 6–203(a)'s requirements do nothing more than 'provide additional means by which fraudulent or otherwise improper signatures ... may be detected.'" *Citizens for Open Gov't,* 201 Md.App. at 625, 30 A.3d at 258 (quoting *Doe,* 406 Md. at 733, 962 A.2d at 363).

 This Court's analysis in *Barnes* of whether the statutory petition signature requirements are consistent with Article XVI, § 4 of the Maryland Constitution, as well as the similar analysis conducted by the Court of Special Appeals in *Citizens for Open Gov't,* is instructive in our evaluation of the issue before us in the case *sub judice.* In the present case, Petitioners claim that § 6–203(a) and COMAR § 33.06.03.06B(1) are inconsistent with Article XI–A, §§ 1A and 7. It is clear that Article XVI, § 4 and Article XI–A, § 7

contain substantially the same language with respect to petitions and the powers granted to the General Assembly in connection therewith. In addition, the requirements contained in § 6–203(a) and COMAR § 33.06.03.06B(1) apply to petition signatures in both the referendum context and in the context of charter board nominating petitions. Similar to the determinations made in *Barnes* and *Citizens for Open Gov't*, we conclude that the challenged enactments are not inconsistent with the Maryland Constitution. Article XI–A, § 7 addresses the form and content of the affidavit to be signed and submitted by the person or persons procuring the petition signatures. The petition signature requirements contained in the challenged enactments are reasonable and proper requirements enacted to further the purposes underlying Article XI–A, § 7. Those requirements provide additional means by which signers may be identified and fraud in the petition signing context may be prevented. They are not inconsistent with the language or spirit of Article XI–A, §§ 1A and 7 of the Maryland Constitution.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY IS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY APPELLANTS.**