REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2575

September Term, 2012

GAB ENTERPRISES, INC.

v.

ROCKY GORGE DEVELOPMENT, LLC,
*et al.*,

Graeff,
Berger,
Nazarian,

JJ.

Opinion by Nazarian, J.

Filed: January 29, 2015

* Judge Timothy E. Meredith, Judge Andrea M. Leahy, and Judge Kevin F. Arthur did not participate, pursuant to Md. Rule 8-605.1, in the Court's decision to report this opinion.

"A bad beginning makes a bad ending,"[1] and in this case, the parties' difficult relationship at the beginning of this development project presaged its eventual demise. In 2003, Rocky Gorge Homes, LLC ("Rocky Gorge") and GAB Enterprises, Inc. ("GAB") created RGHGAB at Frederick, LLC ("RGHGAB"), to buy, develop, and sell property in Frederick County. Like many others, this deal failed to predict the catastrophic collapse of the real estate market about five years later, which left RGHGAB holding a figurative bag that contained a nearly $9 million promissory note guaranteeing property worth less than $3 million. In an effort to salvage its interest, and after some back-and-forth with GAB, RGHGAB formed another corporation, Waverley View Investors, LLC ("Waverley"), to purchase the promissory note at a much-reduced price. But GAB says that it wished to acquire the property itself, and initiated involuntary bankruptcy proceedings against RGHGAB (the "Bankruptcy Proceeding") that sought to force Waverley out and obtain the note for its own. Those efforts did not succeed, but did generate a written opinion explaining the issues the Bankruptcy Court was and was not deciding in ruling against GAB.

GAB tried again in the Circuit Court for Frederick County in a nine-count complaint (the "Circuit Court Proceeding") alleging that the CEO of Rocky Gorge, Christopher Dorment, fraudulently formed Waverley to eradicate GAB's interest in RGHGAB. The circuit court granted Rocky Gorge's Motion to Dismiss and for Summary Judgment on the ground that the previous findings of the Bankruptcy Court barred GAB's claims under the doctrine of collateral estoppel. We disagree that the Bankruptcy Court decision resolved the

---

[1] Euripides, *Aeolus*, fragment 32.

claims Rocky Gorge brings in this case, so we reverse the dismissal, as well as the circuit court's decision to grant summary judgment on other contested counts, and remand for further proceedings.

## I. BACKGROUND

We start with the Note that set the process in motion, then watch the parties' business relationship unravel as the property's value plummeted, then chronicle the two phases of litigation that bring everyone before us.

### 1. Purchase (RGHGAB) and Repurchase (Waverley) of the Note

Rocky Gorge, as an 80% member, and GAB, as a 20% member, formed RGHGAB as a Maryland limited liability company on November 10, 2003. The Chairman and CEO of Rocky Gorge at the time was (and by all indications still is) Christopher Dorment. His wife, Rosemary, plays a role later on, but was not a member of Rocky Gorge. GAB acted through its President, Gary Berman. RGHGAB was formed to purchase a promissory note on a loan secured by a 93-acre tract of land in Frederick (the "Property"), then foreclose. Under the RGHGAB Operating Agreement (the "Operating Agreement"), RGHGAB would develop the Property. The Operating Agreement tasked Rocky Gorge with obtaining financing and required all parties to "use good faith and best efforts in all dealings."

2

The parties secured the financing with a Promissory Note dated January 30, 2004 ("the Note"[2]), made by Rocky Gorge and held by BB&T Bank ("BB&T"). The original principal amount of $2.75 million tracked the principal amount in an accompanying Indemnity Deed of Trust. A recital to the Note contained Mr. Dormant's personal guaranty of *full* repayment and GAB's guaranty of *partial* repayment in the event of a default. As time went by, the principal amount of the Note was amended, ballooning to nearly $9 million as of September 12, 2007, and the maturity date ultimately was extended to January 15, 2010. GAB claims that it continued to guarantee partial repayment of the Note only because of "Mr. Dorment's re-affirmation that he had, and would retain, sufficient assets to secure each modification of the Note."

In the meantime, the parties ran into trouble, not just because the property value fell as the amount due under the Note rose, but also because Mr. Dorment and Mr. Berman seem never to have agreed on the terms of the Operating Agreement. As early as 2005, GAB filed suit against Rocky Gorge, claiming that it violated the Operating Agreement by trying to sell some of the Property. The parties ultimately settled that dispute and executed a Second Amendment to the Operating Agreement, under which GAB obtained additional development rights. There was a second round of litigation in 2008 and 2009, after a dispute

[2] Although the parties both discuss the formation of the Note at length, we do not see a copy of the Note itself in the record. (They refer either to a later 2010 note in the record that memorializes the 2004 transaction, or the Bankruptcy Court's opinion discussing it.) The parties don't dispute the formation or validity of the Note, however, or that the original borrower on it was Rocky Gorge, rather than RGHGAB or any of the individuals.

3

between the parties about a payment to RGHGAB on the Note from BB&T for nearly $150,000. According to the Complaint in this case, Rocky Gorge ultimately was ordered by an arbitrator to repay the funds to BB&T, but never did so. It is not clear from the record what, if any, action GAB undertook in response.

By late 2009, the Property's value had dropped far below the increasing amount due under the Note. Although the record does not contain specific evidence of why no development occurred throughout this time (we surmise that the parties were occupied watching the Property decline in value and feared throwing good money after bad), RGHGAB found itself with no funds and a need for further financing. Mr. Berman declined to make further contributions, although he suggested turning to his father, Malcolm Berman, for funding. It seems, though, that whatever conditions the senior Mr. Berman wished to impose, Mr. Dorment found them unfavorable and pursued further funds on his own.

We will discuss below, and in detail, the findings of the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") in the litigation that underlay the Circuit Court's dismissal of this case. The Bankruptcy Court's eventual decision provides, however, a succinct narrative of the next phase of the parties' relationship:[3]

> *[a]t all times [Mr.] Dorment advised [Mr.] Berman of the situation facing the venture.* This was required in that *Section 5.3 of the Operating Agreement required [Mr. Berman's]*

---

[3] The Bankruptcy Court mistakenly referred to Mr. Berman in places as "Robert" Berman rather than "Gary" Berman. We correct that error where it appears and harmonize the varied spellings of "Waverley."

4

> *agreement* to dissolve or terminate the venture, to do anything in contravention of the agreement, to do any act that would make it impossible to carry on the ordinary business of the venture, or to possess or assign rights in company property or assign rights in company property other than for a company purpose.
>
> By a letter dated November 12, 2009, [Mr.] Dorment advised [Mr.] Berman of his intention to buy [the Note] at a discount and that he was seeking fresh equity capital and that this would require ceding of control of the project and dilution of their equity stakes. *How he could cede control of the project without the consent of [Mr.] Berman is unclear.*

(Emphasis added.)

On February 3, 2010, Mr. Dorment proposed to Mr. Berman that they form a new entity to take on the Note. Even the Bankruptcy Court, looking back, could not discern how Mr. Dorment intended to do this without Mr. Berman's consent, but Mr. Dorment apparently had "concluded that the only practical course of action would be for a new entity to buy [the Note], and 'if the Managing Member reaches that conclusion, the Managing Member would proceed ahead with the goal of protecting the interests of the Company even if the minority member objected.'"

At this point, BB&T had extended the Note's maturity date of January 15, 2010. But when Mr. Dorment sought to enter a forbearance agreement with BB&T on March 30, 2010, Mr. Berman—"true to his uncooperative nature," as the Bankruptcy Court put it—"refused to sign the agreement." Mr. Dorment's continuing efforts to marshall support from Mr.

5

Berman or his father were unavailing.[4] Mr. Dorment then obtained a commitment from another bank that would let Waverley buy the note from BB&T. Under the new deal, Mr. and Mrs. Dorment would serve as personal guarantors, the obligation would be secured further by the Note, and Waverley would act as the purchaser. Rocky Gorge assigned the note purchase agreement to Waverley, completing the transaction (in which, by the way, Waverley agreed to release all prior guarantees, including GAB's) on September 17, 2010. Then, in October 2010, Waverley undertook to foreclose on the Property.

GAB resisted these efforts almost immediately. On October 28, 2010, it filed a Motion to Stay the Sale of Property and Dismiss Foreclosure Action in the Circuit Court for Frederick County (the "Motion to Stay"). Although we now know that the interests of the GAB and RGHGAB ended up adverse to one another, at the time GAB sought the stay derivatively on *behalf* of RGHGAB. The details don't matter here, but the short story is that after this Court denied RGHGAB's (*i.e.*, GAB's) appeal of the Circuit Court's denial of the Motion to Stay, Waverley resumed its efforts to foreclose.

---

[4] The Bankruptcy Court refers to a July 2010 meeting in which Mr. Dorment tried to propose terms for Malcolm Berman to buy the Note. "At no time did Malcolm discuss anything but generalities and never was anything put in writing by him in regard to his advancing money for the project. Following the meeting, [Mr.] Dorment sent Malcolm a Term Sheet that he found unacceptable." E-mails between Mr. Dorment and Mr. Berman that were introduced as attachments to the Complaint demonstrated the parties' antipathy toward one another and chronic distrust.

6

## 2. The Bankruptcy Proceeding

Undaunted, GAB looked to another forum, and filed a Petition for Involuntary Bankruptcy (Chapter 7) in the Bankruptcy Court on January 11, 2011. The Petition was unusual: GAB listed no other petitioning creditors in the Petition and characterized its own claim as a loan in the amount of nearly $440,000. The filing brought the foreclosure proceeding to an abrupt halt because of the automatic stay that issued from the Bankruptcy Court, so Waverley sought relief from the stay on February 22, 2011, arguing (in the "Motion for Relief") that it should be permitted to foreclose on the Property as a secured creditor. GAB opposed the Motion for Relief, alleging that Mr. Dorment "secretly created Waverley for the purpose of improperly transferring [RGHGAB's] assets and other corporate opportunities to Waverley, and wiping out the interests in [RGHGAB's] property of not only GAB but also [of RGHGAB's] other creditors." As far as we can tell, the Motion for Relief was not addressed directly by the Bankruptcy Court.

Next, the Trustee in the Bankruptcy Proceeding filed a First Amended Complaint for Equitable Subordination and Equitable Disallowance on May 9, 2011 (the "Bankruptcy Complaint") against Rocky Gorge and Waverley.[5] The Trustee asserted that Mr. Dorment, Rocky Gorge, and Waverley had "engaged in inequitable conduct" and improperly engaged

_____

[5] The *Trustee* filed the action, not GAB, but the Bankruptcy Complaint named no interested parties other than those we have named above and GAB was the only party that stood to benefit from any subordination of Waverley's claim. The Bankruptcy Court refers in its opinion to six other unsecured creditors, but the details aren't before us.

in self-dealing that harmed RGHGAB and its creditors (including only GAB by name). The complaint sought equitable subordination of Rocky Gorge and Waverley's claims against RGHGAB and equitable disallowance of these claims.

The Bankruptcy Court held a trial that spanned three days in October and November 2011, and on April 24, 2012 issued a Memorandum of Decision (the "Memorandum") and entered Judgment for Waverley and Rocky Gorge dismissing the Bankruptcy Complaint. The Court found broadly that Mr. Dorment's decision to assign the Note to Waverley caused no harm to any of the creditors—GAB or any of the six creditors that lacked priority claims. It approached the question three different ways:

*First*, the Bankruptcy Court found at the outset "*a total absence of harm* by the actions complained of to the one creditor holding a secured claim [*i.e.*, Waverley[6]] or the [remaining] holders of claims without priority." (Emphasis added.) A cause of action for equitable subordination in involuntary bankruptcy *requires* harm to creditors (citing *In re: Kreisler*, 546 F.3d 863, 866-67 (7th Cir. 2008)), and as the Bankruptcy Court saw it, "[t]his project was so far indebted to [Waverley] that there was no scenario under which the Trustee's constituent body, the holder of unsecured claims, could receive any distribution whatsoever." The Bankruptcy Court qualified its decision by pointing out that "Rocky Gorge might have a fiduciary relationship to GAB, but that is not what this adversary proceeding concerns."

---

[6] The Court explained that Waverley was "the present holder of a secured claim in the sum of $9,642,437.46 sought to be subordinated."

8

*Second*, the court denied GAB's claim for equitable subordination. GAB had sought to subordinate Waverley's claim and transfer its lien to the Trustee; it also sought equitable subordination of Rocky Gorge's claim. Under 11 U.S.C.A. § 510 (2004), which codifies the doctrine, a court may "subordinate . . . all or part of an allowed claim to all or part of another allowed claim." *Id.* § 510(c)(1). But again, equitable subordination *requires* a showing of injury to other creditors, and, again, the Bankruptcy Court found that "no harm was caused *to the creditor body* by [Mr.] Dorment forming a group to acquire the Note in and of itself." (Emphasis added.)  The court cautioned once more that "there could well be a cause of action in what is essentially this two-party dispute between [Mr.] Berman and [Mr.] Dorment operating through their legal entities. But resolution of the potential dispute is *for another day in another jurisdiction*." (Emphasis added.)

*Third*, the Trustee sought not just to subordinate, but also to *disallow* Waverley's and Rocky Gorge's claims, which as the Bankruptcy Court noted is available "'only 'in extreme instances—perhaps very rare—where it is necessary as a remedy.'" (quoting *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 80, 99 (S.D.N.Y. 2008)). The Bankruptcy Court again found that there was "nothing in the nature of inequitable conduct or unfairness on [Mr.] Dorment's part. The creditors . . . were then at least $5 million under water and suffered no change in position as a result of the transfer of the Note to parties friendly to [Mr.] Dorment." The court further found "as a fact that the primary motivation of [Mr.] Dorment was to limit his liability on the guaranty and secondarily to protect the venture."

Once again, the court was careful to point out that "[Mr.] Berman, as a partner-creditor, may have a claim against his co-venturer. However, the court finds nothing in the behavior of [Mr.] Dorment or his co-venturers in Waverley to mandate the awesome punishment of equitable disallowance being imposed on them."

GAB appealed the Bankruptcy Court's decision to the United States District Court for the District of Maryland, but dismissed the appeal pursuant to a stipulation by the parties on September 21, 2012.

### 3.    The Circuit Court Proceeding

On September 28, 2012, GAB filed the nine-count complaint that initiated this case (the "Complaint"). GAB named Rocky Gorge, Mr. Dorment, his wife Rosemary, and Waverley as defendants (collectively the "Defendants"), and alleged that Mr. Dorment "secretly created [Waverley] for the purpose of improperly transferring RGHGAB's assets to Waverley and thus wiping out GAB's interest in RGHGAB," and that all the Defendants, even Mrs. Dorment, were part of this "fraudulent scheme." The Complaint listed counts in intentional misrepresentation, constructive fraud, negligent misrepresentation, and breach of fiduciary duty against Rocky Gorge and Mr. Dorment (Counts I, II, III, and VIII respectively); fraudulent conveyance claims against Mr. and Mrs. Dorment (Counts IV and V); tortious interference and civil conspiracy claims against all Defendants (Counts VI and IX); and a breach of contract claim against Rocky Gorge (Count VII). GAB sought compensatory damages of $7.5 million and punitive damages of $5 million against each

10

defendant and also asked the court to set aside GAB's guaranty on the Note and certain unidentified asset transfers between Mr. and Mrs. Dorment.

On November 5, 2012, the Defendants moved to dismiss and for summary judgment. They argued that GAB had had more than one opportunity to litigate the issues raised here before—not just in Bankruptcy Court, but in the 2005 and 2009 litigation—and that the issues and claims raised by GAB had already been decided. They also argued at length that GAB's claims were not its to bring derivatively, but belonged to RGHGAB under the Operating Agreement, and they attacked the underlying substance of the remaining counts.

The trial court held a hearing on February 12, 2013 that centered primarily on the collateral estoppel effect of the Bankruptcy Court's decision. As counsel for Rocky Gorge put it, the "overarching theme in the Bankruptcy Court was . . . that somehow Waverley had obtained [the Note] through inequitable [conduct]" and that RGHGAB should have allowed GAB the opportunity to purchase the Note instead. Specifically, Rocky Gorge argued that the Bankruptcy Court "specifically decided" (1) that there was an absence of harm to RGHGAB and its creditors (GAB included); and (2) that there was no inequitable conduct on Mr. Dorment's part, which Rocky Gorge claimed should preclude GAB from proceeding against the Defendants in circuit court.[7]

---

[7] At the time, GAB's counsel agreed to dismiss Count VIII, as the trial court suggested there was no independent cause of action for breach of fiduciary duty, but reserved the right to subsume such a claim within the remaining counts.

Counsel for GAB countered that the Bankruptcy Judge had made clear that he was deciding the Bankruptcy Proceeding only and expressly anticipated that "the circuit court" would resolve the parties' differences anew. Moreover, as GAB saw it, the Bankruptcy Court had focused on the factual issues about Mr. Dorment, not as they related to GAB but as they related to the creditors overall, because the Bankruptcy Judge was tasked with determining the specific question of whether the claims of other creditors (*i.e.*, Waverley) could be equitably subordinated to GAB's claim. GAB highlighted one portion of the Bankruptcy Court's October 22, 2012, Order approving the sale of the Property that expressly left GAB's claims against its partners unresolved:

> Notwithstanding any provision of this Order Approving Sale to the contrary, . . . this specific Order Approving Sale shall not impact or prejudice [Mr. Berman's or GAB's] direct claims against any non-debtor third party.

At the February 12 hearing, GAB's counsel cited another statement from the Bankruptcy Judge that ostensibly narrowed the effect of his holding, which led the circuit court judge to ask the following question about the scope of the order:

> THE COURT: Is it the rulings that bar [the circuit court proceeding] or the findings of fact that [bar] it—
>
> [COUNSEL FOR GAB:] Well, I think it would be—
>
> THE COURT: And there's a distinction—
>
> [COUNSEL FOR GAB:] Yes

* * *

12

THE COURT: . . . a finding of fact is not his ruling. . . . [I]n order to make the ruling he found some facts. And [Rocky Gorge's] earlier argument was it's the fact that [the Bankruptcy Judge] found this and this as a matter of fact bars these claims.

[COUNSEL FOR GAB:] Well—

THE COURT: *Which is basically a collateral estoppel right there.*

[COUNSEL FOR GAB:] —right, . . . I don't think that [the Bankruptcy Judge] made findings of fact that would have that effect because he said that his findings of fact that everything he did there would not have that [effect]. . . . [The Bankruptcy Judge] did not make findings that relate to all aspects of our claims for sure, no matter how you look at this.

(Emphasis added.) The trial court continued to press GAB's counsel about the findings of fact that the Bankruptcy Court *did* make, appearing especially concerned with that court's finding that there was "no inequitable conduct or unfairness" on Mr. Dorment's part. As the trial judge asked counsel for GAB, "if you make the finding of fact for a certain purpose, isn't that still a finding of fact binding on the parties?"

The trial court's inclinations at the hearing were borne out in the Order it ultimately issued on February 21, 2013, in which it accepted Rocky Gorge's collateral estoppel argument:

> [T]he Court find[s] that the primary focus of the Defendants' argument for Summary Judgment [is] collateral estoppel in that [the Bankruptcy Judge] found a "total absence of harm to the creditors," to include [GAB], and that [the Bankruptcy Judge] found "a lack of any inequitable conduct or unfairness" on the part of [Rocky Gorge], and that these findings are binding upon the parties in this matter, and . . . these findings of fact are

13

dispositive as to Counts I, II, III, VI and VII of the . . . Complaint; and

[T]he Court further find[s] that [Rocky Gorge's] argument for Dismissal applies to Counts IV and V, in that [GAB] failed to state a claim upon which relief can be granted, and [GAB] conceding that there are no additional facts to allege; and upon the Court's finding that [GAB's] allegation that [Mr. Dorment] failed to keep sufficient liquidity in his assets to guarantee the loan, is an action to be brought by the secured party, rather than by [GAB].

GAB had agreed to dismissal of Count VIII, and the trial court granted summary judgment as to the conspiracy claim in Count IX because it could not survive without a finding of liability on at least one of the underlying counts. The court also dismissed Counts IV and V of the Complaint (based on Rocky Gorge's having filed a motion to dismiss in connection with those counts, and not a summary judgment motion).

GAB filed a timely Notice of Appeal on February 26, 2013.

## II. DISCUSSION

Much as they have outside the courtrooms, the parties clash on virtually every judicial decision relating to this property. As the Bankruptcy Court put it, "[t]hroughout [the] life of the agreement, the relationship between [Mr.] Berman and [Mr.] Dorment was acrimonious and marked by ongoing disputes almost from the start." And admittedly, GAB has taken every opportunity, in more than one forum, to litigate the terms of the Operating Agreement

and many other elements of this series of relationships.[8] But applying collateral estoppel here would hold GAB to a decision that arose in a different context, that decided different claims for a different purpose, and that the presiding judge specifically meant not to reach.

We hold that the facial similarity of interests or issues in the two cases cannot overcome the core substantive differences, and we reverse the trial court's grant of summary judgment to Rocky Gorge. In concluding that collateral estoppel does not apply, we express no views on the merits of GAB's claims (on which the trial judge, too, declined to opine) beyond allowing the case to proceed past the dismissal. We also reverse the trial court's dismissal of the two counts against Mr. and Mrs. Dorment, because the allegations in the Complaint sufficiently alleged the elements of a fraudulent conveyance (Counts IV and V) that the court should not have granted Rocky Gorge's Motion to Dismiss, and we remand the entire case for further proceedings.

---

[8] GAB framed the issues as follows in its Questions Presented:

1. Did the trial court err in concluding as a matter of law that GAB's claims were precluded pursuant to the doctrine of collateral estoppel?

2. Did the trial court err in entering summary judgment in favor of Appellees on Counts I, II, III, IV, V, VI, VIII, and IX of [GAB's] complaint?

3. Did the trial court err in concluding that GAB's fraudulent conveyance claims against Mr. Dorment and Mrs. Dorment (Counts IV and V of [GAB's] complaint) failed to state a claim upon which relief could be granted?

We review the grant of a motion to dismiss by the circuit court for legal correctness, and "[t]he grant of a motion to dismiss is proper if the complaint does not disclose, on its face, a legally sufficient cause of action." *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md. App. 772, 785 (1992) (citation omitted). We "presume the truth of all well-pleaded facts . . . along with any reasonable inferences derived therefrom." *Higginbotham v. Public Serv. Comm'n,* 171 Md. App. 254, 264 (2006) (citation omitted). And "[w]e will affirm the dismissal if 'the facts and allegations, so viewed, would nevertheless fail to afford plaintiff relief if proven.'" *Kendall v. Howard Cnty.*, 204 Md. App. 440, 447 (2012) (quoting *Higginbotham*, 171 Md. App. at 264), *aff'd*, 431 Md. 590 (2013) .

We review *de novo* the portions of the trial court's decision granting summary judgment. *Wooldridge v. Price*, 184 Md. App. 451, 457 (2009). "The question of whether the trial court properly granted summary judgment is a question of law and is subject to *de novo* review on appeal. If no material facts are in dispute, we must determine whether summary judgment was correctly entered as a matter of law." *Springer v. Erie Ins. Exch.*, 439 Md. 142, 156 (2014) (quoting *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 541-42 (2007)).

16

**A.** **The Doctrine Of Collateral Estoppel Requires *Identity* of *Essential* Issues In Prior Litigation.**

Collateral estoppel has often been described as a doctrine absorbed within *res judicata*; the doctrines seem to be distinguished almost as often as they are confused.[9] *Res judicata* holds parties to a *claim* that they have previously litigated, acting as an

> "absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."

*John Crane, Inc. v. Puller*, 169 Md. App. 1, 23 (2006) (quoting *LeBrun v. Marcey*, 199 Md. 223, 226-28 (1952)). Collateral estoppel, on the other hand, operates collaterally to preclude relitigation of *issues* that the same parties already had litigated:

> "[W]here the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered."

*Id.* at 24 (quoting *LeBrun*, 199 Md. at 227 (emphasis omitted)). To determine whether GAB is collaterally estopped from bringing the claims it raises in this case, we view the current action against the backdrop of the prior one by asking four questions:

---

[9] Both doctrines evolved in order to "'avoid the expense and vexation of multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions.'" *Colandrea v. Wilde Lake Cmty. Ass'n*, 361 Md. 371, 387 (2000) (quoting *Janes v. State*, 350 Md. 284 (1998)).

17

<blockquote>

i.      Was there a final judgment on the merits in the prior litigation?

ii.     Was the party against whom the plea is asserted a party or in privity with the party to the prior adjudication?

iii.    Was the issue decided in the prior litigation identical with the issue presented in the subsequent litigation?

iv.    Was the issue actually litigated essential to the judgment in the prior action?

</blockquote>

*Brown & Sturm v. Frederick Rd. Ltd. P'ship*, 137 Md. App. 150, 192 (2001) (footnote omitted).[10] The third and fourth prongs are the ones at issue here, and we conclude that the issues litigated in the Bankruptcy Proceeding were neither essential nor identical to those before us. The Bankruptcy Court decided the narrow issue of whether Mr. Dorment acted with ill-will based on evidence that came before it in connection with a claim designed to determine the rights *of creditors*, not to address the relative rights and obligations between Rocky Gorge and Mr. Berman. The relationship between GAB and Mr. Dorment did not bear on the legal issues before the Bankruptcy Judge and, as the court took pains to point out, it did not address that relationship in deciding the equitable subordination or disallowance questions before it.

---

[10] Our 2001 decision in *Brown & Sturm* came after a prior round of litigation in that case that gave rise to our earlier reported decision in *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 121 Md. App. 384, *rev'd*, 360 Md. 76 (2000). Neither that decision nor the Court of Appeals's reversal had anything to do with the collateral estoppel question.

**B.** **The Issue Before The Circuit Court Is Not *Identical* To The Issue Decided By The Bankruptcy Court.**

The penultimate inquiry in the test articulated in *Brown & Sturm*, whether the issue in the Bankruptcy Proceeding was identical to the one here, seems simple enough. But the answer depends on how broadly we define the scope of the prior court's inquiry. The way Rocky Gorge sees it, the "issues" here are identical because the conduct that the Bankruptcy Judge "found caused no harm to GAB" is the "same conduct that GAB now claims harmed it." Moreover, according to Rocky Gorge, the Bankruptcy Complaint contains the "exact same allegations" in both cases, and the Bankruptcy Judge decided them already.

At a closer look, though, we can see readily that the issues decided in the Bankruptcy Proceeding are not like[11] the issues alleged in GAB's complaint.[12] *First*, the Bankruptcy

---

[11] We are reminded of a song from *Sesame Street* that accompanied a similar comparative analysis:

> One of these things is not like the others,
> One of these things just doesn't belong,
> Can you tell which thing is not like the others,
> By the time I finish my song?

*See* Sesame Street: Episode 1 (Children's Television Workshop Nov. 10, 1969), music by Joe Raposo, lyrics by Jon Stone.

[12] As we frame the question, we wonder whether the second prong of the *Brown & Sturm* test, which requires privity between the parties, is met. But the parties haven't raised the issue, and it doesn't appear to have formed a basis of the circuit court's decision, so we assume that it is met without addressing the question further. *See Cnty. Council of Prince George's Cnty. v. Offen*, 334 Md. 499, 508 (1994) ("Ordinarily, an appellate court will consider only those issues that were raised or decided by the trial court, unless the issue concerns the jurisdiction of the court to hear the matter." (citations omitted)).

19

Court examined the rights of RGHGAB's creditors, not GAB's. The real "plaintiff" in the Bankruptcy Proceeding was not GAB but the Trustee, whose job under the Bankruptcy Code is to value and liquidate assets of a Chapter 7 debtor and determine how to apportion the proceeds among creditors, not to determine the relative merits of private disputes between the debtor and any one creditor. *See* 11 U.S.C.A. § 704 (2004, 2014 Supp.) (explaining that the Trustee in a Chapter 7 bankruptcy "shall collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest"). The Trustee focused instead on establishing the *effect* on creditors of harm—from any source—and the Trustee's interests might or might not align with GAB's or that of any other individual creditor. *See Richman v. FWB Bank*, 122 Md. App. 110, 152-53 (1998) (characterizing the Trustee as the party prosecuting a turnover action in the context of a bankruptcy proceeding); *see also Adams v. Manown*, 328 Md. 463, 477 (1992) (substituting trustee for debtor and noting that the "trustee in bankruptcy is the real party in interest," where debtor had secured a $43,000 jury verdict against a third party).

*Second*, the Bankruptcy Court demonstrated, both by citing to the purposes of subordination and disallowance actions *and* by declining to delve into the relationship between GAB and Rocky Gorge, that it was not determining *any* potential liability between those two parties. As the court stressed in its opinion, the creditors' "'welfare is the primary focus of equitable subordination law'" (quoting *Adelphia Recovery Trust*, 390 B.R. at 99), and the goal of allowing equitable subordination is "'to remedy some inequity or unfairness

20

perpetrated *against the bankrupt entity's other creditors* or investors by postponing the subordinated creation's right to repayment until others' claims have been satisfied.'" (quoting *In re Official Committee of Unsecured Creditors for Dornier Aviation (North America) Inc.*, 453 F.3d 225, 232 (4th Cir. 2006)). By its own reckoning, the Bankruptcy Court determined the rights of *creditors* vis-à-vis each other and RGHGAB, rather than unpacking the rights of *these parties* vis-à-vis each other.[13]

GAB was competing (theoretically, at least) with other creditors either to move to the front of the line (by equitably subordinating the claims of the remaining creditors, most notably Waverley), or having the court disallow Waverley's claim altogether. The Court declined to permit equitable disallowance of Waverley's claim:

> The creditors, as creditors [is] explained above, were then at least $5 million under water and *suffered no change in position as a result of the transfer* of the Note to parties friendly to [Mr.] Dorment. *[Mr.] Berman, as a partner-creditor, may have a claim against his co-venturer.* However, the court finds nothing in the behavior of [Mr.] Dorment or his co-venturers in Waverley *to mandate the awesome punishment of equitable disallowance being imposed on them*.

(Emphasis added.) The standard used by the Bankruptcy Court in denying equitable relief under bankruptcy law bore no resemblance to the legal standards that might apply in resolving the parties' rights and obligations to each other under Maryland corporate law and

---

[13] "By design, bankruptcy law involves difficult choices between competing interests." *In re Merry-Go-Round Enterprises, Inc.*, 180 F.3d 149, 162 (4th Cir. 1999). In a Chapter 7 proceeding, those competing interests are competing *creditors*, of which GAB was theoretically one.

their operating documents. Put another way, the legal contours of their relationship were "not like" the issues decided in the Bankruptcy Proceeding, so the decision there has no collateral estoppel effect on the issues GAB raised in its circuit court complaint.

## C. The Issue Before The Circuit Court Was Not *Essential* To The Decision Of The Bankruptcy Court.

We explained in *Puller* the purpose of the last prong of the collateral estoppel test: "[i]n order to preclude the relitigation of a factual issue in a subsequent case between the same parties, the *sine qua non* is that the factual issue was *actually litigated on its merits* in the earlier case." *Puller*, 169 Md. App. at 26. We quoted in turn an earlier Supreme Court decision, *Ashe v. Swenson*, 397 U.S. 436 (1970), that refined the "fact" distinction:

> "'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an *issue of ultimate fact* has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

169 Md. App. at 26 (quoting *Ashe*, 397 U.S. at 443).

There is some divergence among the cases analyzing the exact phrasing of this last question. The Court in *Brown & Sturm* looked back to an opinion of this Court, *Deitz v. Palaigos*, 120 Md. App. 380, 383 (1998), that in turn relied on a Court of Appeals opinion, *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547 (1989). But more recently, the Court of Appeals in *Buruss v. Board of Cnty. Comm'rs of Frederick Cnty.*, 427 Md. 231 (2012), reordered the points to ask, as compared with the fourth inquiry that we quote above,

22

whether "'the party against whom the plea is asserted [was] given a fair opportunity to be heard on the issue?'" *Id.* at 250 (quoting *Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18-19 (1977)). The logic of the rule is the same whichever standard we use, and is driven as much by common sense as anything else—**if an issue didn't matter in** (read "was essential to" per *Brown & Sturm*) **the first round of litigation, there's no reason to think that the parties would have had the best chance there** (read "a fair opportunity to be heard" per *Buruss*) **to fight it out** (read "actually litigate [an issue] on its merits" per *Puller*).

Here, the Bankruptcy Judge stressed that his role was *not* to sort out the rights and duties as between Rocky Gorge/Mr. Dorment and GAB/Mr. Berman,[14] and in fact he specifically left the job for another day in another forum. The Court asked *not* whether Mr. Dorment had acted in some way to disenfranchise Mr. Berman or GAB, or whether he breached any duty he might owe them, but instead whether his business decision was motivated by anything more than self-preservation and, ultimately, what effect that decision had *on creditors for purposes of a bankruptcy claim*. Within that context, the Bankruptcy Court saw Mr. Dorment's decision as perfectly legitimate: "The Note was acquired for two purposes, to gain control of the subject property for the benefit of the new combine and to relieve [Mr.] Dorment of the weight of a $9 million plus guaranty."

---

[14] We use the terms interchangeably, not because each pair shares exactly the same interests, but because the Bankruptcy Court paired them that way.

Again, the Bankruptcy Court pointed out that "Rocky Gorge might have a fiduciary relationship to GAB, but that is not what this adversary proceeding concerns." The Bankruptcy Court also made plain that it did not approach the case from the perspective of litigation in a civil court—it acknowledged that "[t]here could well be a cause of action in what is essentially this two-party dispute between [Mr.] Berman and [Mr.] Dorment operating through their legal entities. But resolution of the potential dispute is for another day in another jurisdiction." The court made the same point in the passage above about Mr. Berman potentially having a claim against "his co-venturer," reiterating in a later opinion that "nothing decided by [the Bankruptcy Court] interferes with that potential action."[15]

A later hearing in the Bankruptcy Court serves as the final nail in the collateral estoppel coffin. When a draft proposed Order (we don't have the benefit of the "before" version here) came before the Bankruptcy Judge, he disavowed language that, in his view, would have had the improper effect of "putting to rest" any actions between Mr. Berman and Rocky Gorge:

---

[15] We can't agree with GAB, as it argued in the circuit court, that the Bankruptcy Judge specifically pointed to the circuit court as the likely landing spot for the next round of litigation. Although at one point the Bankruptcy Court alluded to the action "wind[ing] up in the Circuit," (and here we have not that transcript but just counsel's reading of it at the hearing in *this* action), it is not clear whether he referred to an appeal of *his* opinion to the United States Court of Appeals for the *Fourth Circuit* (after some unspecified appeal first to the United States District Court), or a new action in the *Circuit Court for Frederick County*. Either way, we find ample evidence of the Bankruptcy Judge's intentions in the passages we have cited and see no need to resolve this ambiguity one way or the other.

> THE COURT: [T]he one message in my opinion was that there was a cause of action without passing on the merits of it of any kind, that I was not ruling on, that I had no jurisdiction over. And this order appears to give me jurisdiction over that, and to do certain things that I never intended to do.

As he elaborated, those claims "would have to be pursued in a court of competent jurisdiction." The judge also quipped about one attorney's returning to state court, where he was "more comfortable," for further litigation.

The last of these comments was obviously meant light-heartedly, but we see in the overall tenor of the Bankruptcy Judge's comments a careful effort to confine his holding to the narrow bankruptcy issues before him. He did so through written opinions, oral discussions, and most importantly, by tailoring his findings. And the Bankruptcy Judge's "carve-out" statements, although not binding on us, reveal the court's careful assessment of whether an adjudication of this relationship mattered to (was essential to) him in the course of his decision-making. *See* Restatement (Second) of Judgments § 27 (1982) (noting that a revised comment in the Restatement departs from "emphasizing the distinction between ultimate facts on the one hand and evidentiary facts or mediate data on the other," and instead "states that the question should be whether the issue was actually recognized by the parties as important and by the adjudicator as necessary to the first judgment").

*Richman*, 122 Md. App. 110, is a useful decision in a different but related context. We held there that orders in a borrower's bankruptcy case did not preclude state law fraud claims under the doctrine of *res judicata*. In effect, *Richman* held that where, on more than one

occasion, federal judges had stated their expectation that fraud claims would be litigated in state court, the state court action would not be barred as *res judicata*: "[The Bankruptcy Judge's] orders . . . indisputably fostered appellants' belief that the bankruptcy court would not entertain appellants' State fraud counts. . . . At the very least, in considering whether, 'with propriety,' appellants were able to litigate their State claims in federal court, it was certainly reasonable for appellants to believe that they were required by [the Bankruptcy Judge] to pursue their fraud claims in State court." *Id.* at 156. The Bankruptcy Court's efforts here to carve out the GAB/Rocky Gorge relationship from his domain accomplished the same end.

**D.      The Circuit Court Erred In Dismissing Counts IV and V.**

GAB argues that Counts IV and V, in which it alleged that Mr. Dorment fraudulently transferred assets to his wife in an effort to protect those assets from GAB, sufficiently alleged that fraud and that the circuit court erred in dismissing them. Rocky Gorge does not address this point of appeal in its brief.

The Maryland Uniform Fraudulent Conveyances Act provides that "[e]very conveyance made and every obligation incurred without fair consideration when the person who makes the conveyance or who enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." Md. Code (1975, 2013 Repl. Vol), § 15-206 of the Commercial Law Article. "Cases interpreting the statute have expanded the realm of available remedies to

26

include suits for money judgments against the transferee where he or she 'allows or causes the property to depreciate in value or parts with the property without sufficient consideration or puts it beyond the reach of the court.'" *In re Rood*, 482 B.R. 132, 143 (D. Md. 2012) (quoting *Damazo v. Wahby,* 269 Md. 252, 257 (Md.1973)), *aff'd sub nom. S. Mgmt. Corp. Ret. Trust v. Rood*, 532 F. App'x 370 (4th Cir. 2013), and *aff'd sub nom. S. Mgmt. Corp. Ret. Trust v. Jewell*, 533 F. App'x 228 (4th Cir. 2013)).

We agree with GAB that its allegations of a fraudulent conveyance sufficed to withstand a motion to dismiss. (We do not, by doing so, mean to suggest that the claim necessarily survives a summary judgment motion, which seems more in the nature of what Rocky Gorge argued to the trial court.) In the Complaint, GAB alleged that in early 2010, Mr. Dorment transferred certain assets to his wife, "thereby rendering himself insolvent as he was unable to satisfy his obligations under his personal guaranty securing the note." GAB claims that "without the benefit of discovery," it cannot know the precise assets transferred.

We assume the truth of the allegations in the Complaint for purposes of reviewing a motion to dismiss. *Higginbotham*, 171 Md. App. at 264. Although we recognize that discovery did take place in the Bankruptcy Proceeding, our holding that that litigation does not bar *this* litigation entitles GAB to move forward with these claims in this very different forum. Rocky Gorge's failure to address the point on appeal leaves that position unchallenged, so we reverse the circuit court's decision to dismiss on this claim as well. And

27

because our decision reaches all counts (other than Count VIII, which GAB voluntarily dismissed at the hearing), it follows that the circuit court's dismissal of the conspiracy claims in Count IX warrants reversal as well.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**